[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15064
Non-Argument Calendar
_____

D.C. Docket No. 6:14-cr-00079-JA-GJK-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACQUES MADDOX,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 30, 2015)

Before HULL, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant Jacques Maddox appeals his 78-month sentence, which was imposed after a jury convicted him of aiding and abetting an attempted armed robbery, in violation of 18 U.S.C. § 1951(a) and (b).  That jury, however, also acquitted Defendant of aiding and abetting the use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).  On appeal, Defendant argues that the district court erred in imposing (1) a five-level enhancement based on his accomplice's brandishing of a firearm during the attempted robbery and (2) a two-level enhancement based on injuries inflicted on a victim by this accomplice.  After careful review, we affirm Defendant's sentence.

## I.  Background

### A.    Underlying Offense Conduct

On September 2, 2013, Defendant and accomplice Joe Clinton attempted to rob a Walgreens drug store.  After casing the store, Clinton forced manager William Feeney into the manager's office, while Defendant served as a look-out.  In the office, Clinton pointed a gun at Feeney's head and ordered him to open the safe.  Feeney told Clinton that he was unable to do so because he did not have the key.  Clinton grabbed Feeney's keys, but was unable to open the safe.  Clinton threatened to shoot Feeney if he did not get the money.  After Clinton racked the gun several times in an effort to get it to work, Feeney pulled out a box cutter to defend himself against what appeared to be an imminent attack.  Clinton then

2

pistol-whipped Feeney, causing several cuts on Feeney's head. Clinton and Defendant then fled the store, with Clinton pointing the gun at another employee and at the store customers as he ran out.

Clinton pled guilty to attempted armed robbery and brandishing a firearm during the robbery. Defendant proceeded to a jury trial.

B.    Trial Testimony of Defendant and Clinton

At trial, both Defendant and Clinton testified. As relevant to this appeal, Clinton testified that he and Defendant had talked about robbing the Walgreens Store three or four times prior to the actual day of the robbery. Clinton noted that they did not really have a plan, but both decided to bring guns because they "never [knew] what might happen." On the night of the robbery, he and Defendant met up earlier and discussed "a few things," including that Defendant would "watch [Clinton's] back" during the robbery. Clinton planned to bring a gun with him and showed the gun to Defendant. Defendant handled the gun and polished it with his t-shirt. Defendant also carried his own gun, a Glock .45. When the two men arrived at the Walgreens, they paced around the store for a few minutes, going in and out of the store to avoid suspicion. When he saw store manager William Feeney coming out of the office, Clinton forced Feeney back into the office. Prior to Clinton going into the office, Defendant told him to "go, go ahead and go," which Clinton took to mean that he should go ahead and commit the robbery.

3

While Clinton was in the office, he could see, through the office window, that Defendant was acting as a look-out to make sure no one else tried to come into the office. After Clinton assaulted Feeney, he ran out of the office. Then he and Defendant ran out of the store and drove away in the car that Clinton had driven to the scene. Clinton further admitted that, when arrested, he had lied to the police several times about the robbery of the Walgreens, including initially telling the police that another individual, not Defendant, had robbed the Walgreens with him.

On cross-examination, Clinton acknowledged that he was testifying pursuant to a plea agreement and that, as part of the agreement, the Government had agreed to drop the charges or reduce his sentence on the two robberies, which carried a cumulative mandatory-minimum sentence of 32 years' imprisonment. He agreed that he would do whatever was in his best interest to reduce his sentence. Clinton further acknowledged that he had told the police that he was schizophrenic and bipolar, had memory problems, and used drugs that affected his memory.

Defendant testified in his own defense. He stated that he arrived at the Walgreens separately from Clinton, believing that he was to meet Clinton at the Walgreens before going to a club together. After going into the store once to ask an employee about some medication, Defendant continued to go in and out of the store: once to use the bathroom and other times because he did not like waiting outside. Defendant denied having any knowledge that Clinton planned to rob the

4

store or that he was carrying a gun. (Defendant also denied that he was carrying a gun.) According to Defendant, as he was coming out of the bathroom, Clinton ran past him, at which point Defendant saw that Clinton was carrying a gun. Defendant became scared and ran out of the store with Clinton, but did not get into the car with him.

On cross-examination, Defendant acknowledged that his testimony conflicted with earlier testimony from a store employee about how many times he had been in and out of the bathroom.[1] As to footage from the surveillance camera that showed him walking out of the Walgreens ahead of Clinton, Defendant said that this demonstrated nothing more than unlucky timing on his part. That is, Defendant just happened to be leaving the bathroom and walking out of the store at the very same moment Clinton fled the office where he had assaulted Feeney. Defendant also admitted that he had lied to the police several times about whether he was at the Walgreens on the night of the robbery.

As noted, the jury convicted Defendant of aiding and abetting an attempted armed robbery, but acquitted him of aiding and abetting the use of a firearm in furtherance of a crime of violence.

---

[1] Store employee Melissa Roth had previously testified that Defendant had gone in and out of the bathroom several times that night.

C.    Presentence Investigation Report and Sentencing Hearing

After the jury's verdict, the probation office prepared Defendant's Presentence Investigation Report ("PSR").  The PSR calculated a base offense level of 20, pursuant to U.S.S.G. § 2B3.1(a).  Because a firearm was brandished during the commission of the offense, the PSR applied a five-level enhancement under § 2B3.1(b)(2)(C).  The PSR also applied a separate two-level enhancement because bodily injury was caused to a victim of the offense, pursuant to § 2B3.1(b)(3)(A), yielding a total offense level of 27.  Defendant had three criminal history points, which yielded a criminal history category of II.  Based on a total offense level of 27 and his criminal history category of II, Defendant's guideline range was 78 to 97 months' imprisonment.

Prior to and at his sentencing hearing, Defendant objected to any enhancement for brandishing a weapon or for causing bodily injury to a victim, both of which were based on Clinton's conduct.  Defendant argued that the brandishing enhancement could be applied only if the Government had proved by a preponderance of the evidence that Defendant had advance knowledge that Clinton possessed a gun at the time of the robbery.  And Defendant argued that the Government had failed to meet that burden because its evidence rested entirely on Clinton's testimony, which Defendant deemed not credible.  He further contended that enhancing his sentence based on acquitted conduct violated his Sixth

6

Amendment right to trial.  Defendant similarly argued that the bodily injury enhancement was improperly applied to him because Feeney's injuries were inflicted by Clinton's use of his gun and, once again, Defendant argued that he had no advance knowledge that Clinton would have a gun.

The district court overruled both objections.  The court determined that, for the above enhancements to apply, the Government had to prove by a preponderance of the evidence that the relevant conduct at issue was reasonably foreseeable.  Looking at the totality of the circumstances of the robbery, along with the surveillance video and Clinton's and Defendant's testimony, the court concluded that the Government had proven by a preponderance of the evidence that it was reasonably foreseeable to Defendant that Clinton would brandish a gun during the robbery.  As a logical extension of that conclusion, it was also reasonably foreseeable that Clinton might injure someone during the course of the robbery, particularly given the fact that he was carrying a gun.  After considering the 18 U.S.C. § 3553(a) factors, the court sentenced Defendant to 78 months' imprisonment.

## II.  Discussion

On appeal, Defendant argues that the district court should not have factored Clinton's brandishing of a firearm and causing bodily injury into the Guidelines' calculation for Defendant because Defendant had been acquitted of aiding and

7

abetting the use of a firearm.  Alternatively, he contends that the Government failed to prove such conduct by a preponderance of the evidence.  Finally, Defendant throws a new argument into the mix by asserting that the conduct in question could not be counted as relevant conduct based on the Guidelines' rules on grouping.

A.    Standard of Review

We review *de novo* the district court's interpretation and application of the Sentencing Guidelines.  *United States v. Ford*, 784 F.3d 1386, 1395 (11th Cir. 2015).  We review any constitutional challenges to the sentence under the same standard.  *United States v. Pope*, 461 F.3d 1331, 1333 (11th Cir. 2006).

We review the district court's factual findings for clear error.  *Ford*, 784 F.3d at 1396.  We will therefore not disturb the district court's finding of fact unless we have "a definite and firm conviction that a mistake has been made." *Id.* Among the factual findings a district court may make is whether a preponderance of the evidence supports the application of a sentence enhancement.  *See United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013) (reviewing as a finding of fact the district court's imposition of a sentence enhancement, and noting that the prosecution must establish applicability of enhancement by a preponderance of the evidence).  Where the district court has made a determination as to a witness's credibility, we afford that determination substantial deference.  *United States v.*

8

*Clay*, 483 F.3d 739, 744 (11th Cir. 2007).  We will accept a factfinder's credibility determination unless the proffered evidence is "contrary to the laws of nature" or is "so inconsistent or improbable on its face that no reasonable factfinder could accept it."  *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). The fact that a witness is of dubious character does not, by itself, render his testimony incredible.  *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009).

> B.    Application of Enhancements Notwithstanding Defendant's Acquittal on the Charge of Aiding and Abetting Another in the Violation of § 924(c)

Although the jury convicted Defendant of the count charging him with aiding and abetting the robbery of the Walgreens store, it acquitted him of the count charging him with aiding and abetting his accomplice in the latter's use and carrying of a firearm that was brandished during the robbery, in violation of 18 U.S.C. § 924(c)(1)(A).  Defendant argues that, given the above acquittal, the district court erred when it applied a 5-level enhancement for brandishing a weapon during the robbery under U.S.S.G. § 2B3.1(b)(2)(C) and a 2-level enhancement because a victim of that robbery sustained a bodily injury under § 2B3.1(b)(3)(A).

It is well settled, however, that the sentencing court may consider any fact for which a defendant has been acquitted as long as the Government proves, by a

9

preponderance of the evidence, the occurrence of that conduct and as long as the enhancement results in a sentence below the maximum statutory penalty authorized by the jury's verdict. *See United States v. Faust*, 456 F.3d 1342, 1347, 1348 (11th Cir. 2006); *United States v. Poyato*, 454 F.3d 1295, 1299 (11th Cir. 2006). As the Supreme Court has explained, "sentencing enhancements [under the Guidelines] do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." *United States v. Watts*, 519 U.S. 148, 154 (1997). More to the point, an acquittal does not mean that the defendant is innocent of any particular aspect of the charged criminal conduct; it simply means that the Government failed to prove the defendant guilty beyond a reasonable doubt of the charged offense. *United States v. Campbell*, 491 F.3d 1306, 1317 & n.14 (11th Cir. 2007). And, because "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge," a jury cannot be said to have necessarily rejected any particular fact when it returns a general verdict of not guilty.[2] *Watts*, 519 U.S. at 155.

---

[2] To the extent that Defendant argues that his due process rights were violated by the court's consideration of acquitted conduct when calculating his Guidelines' range, we have noted the possibility that a sentence enhancement based on acquitted conduct might, in "extreme circumstances," deprive the prisoner of due process, but we have never identified such a circumstance. *Clay*, 483 F.3d at 744. We held in *Clay* that the defendant there was not deprived of due process where sentence enhancements based on acquitted conduct resulted in a guideline range, the top of which was below the maximum penalty for the offense on which he was convicted. *Id.*

10

Thus, the merits of Defendant's argument depends on whether the Government proved by a preponderance of the evidence that he engaged in conduct that would warrant the enhancements applied by the sentencing court. We agree with the district court that the Government met its burden.

In calculating a defendant's total offense level, a district court must consider all relevant conduct attributable to the defendant. The Guidelines, which explain the term "relevant conduct" in § 1B1.3, offer three ways in which relevant conduct may arise and be attributable to a defendant for purposes of applying an enhancement. First, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). Second, relevant conduct also includes the acts and omissions taken by a defendant "in concert with others" that was in furtherance of the jointly undertaken criminal activity and that was "reasonably foreseeable" to the defendant. *Id.* § 1B1.3(a)(1)(B). Third, as to offenses that would be grouped under the Guidelines' multiple count grouping rules, relevant conduct also includes any acts or omissions that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2).

The district court concluded that the second trigger for relevant conduct, found in § 1B1.3(a)(1)(B), had been satisfied here. So the question becomes

11

whether the Government proved that Defendant and Clinton had engaged in "jointly undertaken criminal activity" and whether Clinton had engaged in acts "in furtherance of that activity" that were reasonably foreseeable to Defendant. Clearly, Defendant and Clinton engaged together in criminal activity: they attempted to rob the Walgreens store, with Clinton doing the actual robbing and with Defendant acting as the look-out. Indeed, Defendant was convicted of the substantive attempted robbery count, and Clinton pled guilty. Second, it is undisputed that Clinton brandished a firearm while attempting to rob the Walgreens store manager and that the manager suffered bodily injury when Clinton pistol-whipped him. There is no question that these acts, which are the basis for the enhancements imposed by the district court, were done in furtherance of the jointly undertaken attempted robbery of the store.

The only question left then is whether the Government proved by a preponderance of the evidence that it would have been reasonably foreseeable to Defendant that the above conduct by his criminal cohort might occur. The district court concluded that the Government had met its burden, and the district court was right. The court found that Defendant knew that his accomplice, Joe Clinton, possessed a firearm at the time he attempted to rob the Walgreens store. While Defendant denies that knowledge, the district court, which had observed both Defendant and Clinton testify at trial, concluded that Clinton's testimony was

12

credible on this point.  We defer to the court's assessment of the credibility of these witnesses.  *United States v. Clay*, 483 F.3d 739, 744 (11th Cir. 2007). Moreover, the circumstances of the attempted robbery support the court's credibility determination.  Defendant and Clinton had planned to rob this store.  It makes sense that Clinton would have shared a detail as important as the fact that he was carrying a gun to the site of the robbery.  Indeed, the district court also found that Defendant, himself, was carrying a firearm.  And once one concludes that Defendant knew that Clinton was armed with a gun, it makes perfect sense that he could also reasonably anticipate that Clinton might well show that gun to the person whom he was trying to force to hand over the store's money.  After all, isn't that the primary purpose of bringing a gun to a robbery?  As to the injuries suffered by the store manager, the district court was likewise on solid ground in concluding that Defendant could also reasonably anticipate that his admittedly erratic co-conspirator might well use that gun, in some way, on anyone who thwarted his efforts to obtain the sought-after money.  Thus, based on the above evidence, the district court's determination regarding the reasonable foreseeability of the above acts does not give rise to a definite and firm conviction that a mistake has been made.[3]  *See Ford*, 784 F.3d at 1396.

---

[3] Citing the Supreme Court's decision in *Rosemond v. United States*, ___ U.S. ___, 134 S. Ct. 1240 (2014), Defendant also argues that for the challenged enhancements to apply, the Government had to establish that he had advance knowledge that Clinton possessed a firearm.

13

C.    Whether the Guidelines Prohibit Application of the Above Enhancements

For the first time on appeal, Defendant argues that the Sentencing Guidelines prohibit any consideration of Clinton's brandishing of a firearm and causing bodily injury because U.S.S.G. § 3D1.2(d) prohibits the grouping of Defendant's attempted robbery count of conviction and therefore § 1B1.3(a)(2), which expands the applicability of relevant conduct in offenses that are groupable, does not apply.

We generally review *de novo* the district court's interpretation and application of the Sentencing Guidelines. *Ford*, 784 F.3d at 1395. Yet, as to this issue, because Defendant did not raise his grouping argument below, we review this issue for plain error. *United States v. Bonilla*, 579 F.3d 1233, 1238 (11th Cir. 2009). Under plain error review, we will reverse where there is "(1) an error (2)

---

But, as explained, the Government proved that knowledge by a preponderance of the evidence, which is the standard that applies to such sentencing decisions.

Plus, *Rosemond* set out the facts that the Government must prove (beyond a reasonable doubt) in order to convict a defendant of aiding and abetting a § 924(c) count; the decision clearly did not address the standards for determining whether a sentencing enhancement should apply under a Guidelines' provision that expressly applies to conduct that is reasonably foreseeable, not just conduct that one actually knows in advance will occur.

To the extent that Defendant is arguing that the Government also had to prove that Defendant actually knew to a certainty that Defendant would actually brandish the gun, even *Rosemond* did not require such knowledge to sustain a § 924(c) conviction. *See United States v. Payne*, 763 F.3d 1301, 1304 n.2 (11th Cir. 2014) (*Rosemond* required only that a defendant know that one of his confederates was carrying a gun; it did not require knowledge that this confederate would brandish the gun.).

14

that is plain and (3) that has affected the defendant's substantial rights; and . . . (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).

Defendant's argument has no merit under either a plain error or *de novo* standard of review. This is so because, as explained above, § 1B1.3(a)(1)(B) clearly permitted the district court to consider the reasonably foreseeable acts of Clinton, and it was reasonably foreseeable that Clinton would brandish the gun that Defendant knew him to be carrying and that a victim might thereafter suffer a bodily injury. This is also so because § 1B1.3(a)(2), on which Defendant relies, is not remotely applicable in this case.

As to the inapplicability of § 1B1.3(a)(2),[4] this subsection applies only to the type of offense that would be grouped under § 3D1.2(d) were there to be multiple counts of conviction. Because a robbery offense is clearly <u>not</u> the type of offense that would be grouped,[5] this subsection does not even make it out of the starting

---

[4] § 1B1.3(a)(2) applies "solely" to an offense that is of the type that it would be grouped, were there multiple counts of conviction for this offense. And if that type of offense of conviction is present, then relevant conduct will also include:

> all acts and omissions described in subdivisions (1)(A) [aiding and abetting] and (1)(B) [reasonably foreseeable acts] that were part of the same course of conduct or common scheme or plan as the offense of conviction.

As explained in text and in note 5, *infra*, because a robbery offense is not groupable, the premise of § 1B1.3(a)(2) is absent and this subsection has no applicability to this case.

[5] Section 3D1.2(d) provides that where the offense level is determined largely based on factors that are quantifiable, such as loss amount, certain counts of conviction, such as drug trafficking

15

gate for purposes of analyzing the relevant conduct in this case.  But even if it did apply, it would <u>expand</u>, not contract, the possible relevant conduct to include reasonably foreseeable acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction."

Second, the fact that § 1B1.3(a)(2) does not apply to the present offense of conviction does not mean that § 1B1.3(a)(1)(B), which clearly permits inclusion of the conduct at issue as relevant conduct, is thereby neutered.  Indeed, § 1B1.3(a)(2) cannot even be triggered unless there are first acts that would fit within either § 1B1.3(a)(1)(A) or (B).  Further, the fact that § 1B1.3(a)(2) will not apply to a particular count of conviction does not mean that other subsections of the relevant conduct provision cannot be given effect.  As noted, § 1B1.3(a) expands the potential relevant conduct for groupable offenses.  It does not contract use of relevant conduct for other type of offenses.  Were that the case, relevant conduct would be an infrequent occurrence, given the specificity of the fact pattern that can give rise to § 1B1.3(a)(2).  *See United States v. Williams*, 431 F.3d 767, 772-73 (11th Cir. 2005) (rejecting relevant conduct analysis undertaken by district court pursuant to § 1B1.3(a)(2) because offense did not require grouping under

---

offenses, are to be grouped (that is, the offense level will be determined based on the total amount involved) and other specified offenses, such as robbery, will not be grouped (meaning that each count of conviction for those specified offenses may result in the addition of more offense levels consistent with the grouping rules found in § 3D1.3 and 3D1.4).  Translation:  a robbery offense is not groupable under this particular provision.

16

§ 3D1.2(d), but remanding to district court for relevant conduct analysis under "the other provisions of § 1B1.3"); *United States v. Ashford*, 718 F.3d 377, 382-83 (4th Cir. 2013) (holding that even when grouping is not permitted under § 3D1.2(D) and relevant conduct analysis cannot be conducted under § 1B1.3(a)(2), the district court should consider whether conduct is relevant under § 1B1.3(a)(1)); *United States v. Cuthbertson*, 138 F.3d 1325, 1327 (10th Cir. 1998) (holding that when an offense is specifically excluded from grouping by § 3D1.2(d), § 1B1.3(a)(2) does not apply, but instead the court is to limit its relevant conduct analysis to § 1B1.3(a)(1)).

Indeed, the Guidelines make clear that more than one subsection of § 1B1.3 may apply to the same offense.  *See* U.S.S.G. § 1B1.3, comment. (illus. (a)(1)) (stating that "[i]n certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline."); *id.* § 1B1.3, comment. (illus. (b)(1)) (reiterating that "a defendant may be accountable for particular conduct under more than one subsection" and using as an example the fact that a bank robber who drove the getaway car could be accountable under § 1B1.3(a)(1)(A) for the money taken during the robbery because he aided and abetting the taking of the money (which was the specific objective of the conspiracy), and also be accountable for injury to the teller under subsection (a)(1)(B) because such conduct was reasonably foreseeable given the nature of the

17

offense).  *See also United States v. Jones*, 32 F.3d 1512, 1515, 1520 (11th Cir. 1994) (holding that enhancements based on Jones's accomplices' reckless behavior, including brandishing a firearm, was relevant conduct under § 1B1.3(a)(1)(B) in sentence for aiding and abetting robbery).

In short, the fact that multiple provisions of the relevant conduct section may be potentially applicable in a given case does not mean that all provisions must apply in order for relevant conduct to be recognized.  We therefore conclude that the district properly considered as relevant conduct the brandishing of a firearm by Defendant's accomplice and the injury suffered by a victim at the hand of that accomplice.  This conclusion means that the court did not plainly err.

### III.  Conclusion

For the reasons stated above, Defendant's sentence is **AFFIRMED.**